UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

MICHAEL SEARS,

              Plaintiff,

    v.

COUNTY OF BUTTE, et al.,

              Defendants.

No.  15-cv-00589-MCE-CMK

**MEMORANDUM AND ORDER**

     By way of this action, Plaintiff Michael Sears ("Plaintiff") seeks to recover from Defendants County of Butte ("County"), Butte County Sheriff's Office ("Sheriff's Office"), Andy Duch, and John Kuhn, both supervisors within the Sheriff's Office, (collectively "Defendants") for violations of state and federal law arising out of racially-based discrimination and harassment he purportedly suffered during his employment as a sheriff's deputy.  Presently before the Court is Defendants' Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment (ECF No. 17), which Plaintiff timely opposed (ECF No. 25).  For the following reasons, that Motion is DENIED.[1]

///

///

---

[1] Having determined that oral argument would not be of material assistance, the Court ordered this matter submitted on the briefs in accordance with Local Rule 230(g).

**BACKGROUND**

By way of his Complaint, Plaintiff seeks to recover for: (1) discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., (hereafter "Title VII") and California's Fair Employment and Housing Act, Cal. Gov. Code § 12940, (hereafter "FEHA"); (2) discrimination under 42 U.S.C. § 1981; (3) harassment under Title VII and FEHA; (4) retaliation under Title VII and FEHA; and (5) failure to prevent under Title VII and FEHA.[2] Plaintiff, who is African-American and Sicilian, began working for the County as a deputy sheriff in June 2007. Compl. ¶ 3, 15; Defendants' Statement of Undisputed Material Facts ("UMF") No. 1. Over the course of his employment, Plaintiff contends he was subjected to derogatory and hateful speech, including use of the word "Nigger" (the "N-word") and terms such as "Canadian Blue Gum," based on his race.[3] Compl. ¶ 19(a); Pl.'s Opp., ECF No. 25, at 5 (citing Decl. of Grant. A. Winter, ECF No. 25-1, Ex. 2). He offers evidence that use of such terms was pervasive within the Sheriff's Office, that certain individuals within the Sheriff's Office were obviously uncomfortable interacting with people of different races, and that racist jokes were commonplace. See, generally, Pl.'s Statement of Disputed Material Facts ("DMF"), ECF No. 26-1.[4]

To that end, in 2010, an unidentified person "hung a stuffed panda bear doll by the neck from a rope attached to the ceiling in the Sheriff's Office facility where Plaintiff was assigned to work." Compl. ¶ 19(d). It was "clearly visible and obvious to anyone in the room." Id. When Plaintiff questioned what the panda represented and why it was

---

[2] Prior to initiating this action, on July 18, 2014, Plaintiff filed a complaint with California's Department of Fair Employment and Housing ("DFEH") against all Defendants alleging claims for harassment, discrimination, and retaliation based on race and because Plaintiff engaged in protected activity under FEHA. Plaintiff likewise filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on August 12, 2014, against all Defendants under Title VII.

[3] The terms "Blue Gum" or "Canadian Blue Gum" are purportedly racially disparaging terms referring to African-American individuals.

[4] To the extent Defendants object to Plaintiff's underlying evidence, those objections are overruled. See ECF No. 27-5.

there, another deputy, Christopher Denz, responded, in effect, that it was Plaintiff.  Id.
Deputy Denz explained that "the hanging doll symbolized Mr. Sears because Mr. Sears
is half-Black and half-White."  Id.  Mr. Sears reported the foregoing to management,
including to Deputy Duch, but no action was taken to remove the doll for over three
years (until approximately spring 2014).  Id.

      That same year, someone (also unidentified) hung a poster of "mug shots" of
various celebrities (e.g., James Brown and Jessie Jackson).  Id. ¶ 19(e).  Plaintiff's
badge number was written on the poster next to those photographs.  Id.  Finally, an
unnamed deputy sheriff was displaying a swastika as his screen saver on his office
computer.  Id. ¶ 19(k).

      Plaintiff complained to Sergeant (at the time) Steve Boyd about the hanging
panda, the "mug shot" poster, and use of the N-word.  UMF No. 38; Pl.'s Response to
UMF ("Pl.'s Resp."), ECF No. 26, No. 38.  Regardless, now Lieutenant Boyd considered
Plaintiff's concerns to be "just talking," rather than a "complaint," and did not conduct an
investigation.  DMF Nos. 49-51.

      For their part, Defendants also note that Plaintiff himself called deputies with
which he was friends "nigga" as a term of endearment, and they did the same.  UMF
No. 14.  They further argue that many people have told Plaintiff that upon meeting him
they did not realize he was African-American in the first place.  UMF No. 2.  Plaintiff
testified, however, that everyone was aware of his race because when individuals would
inquire if he was Samoan, Tonganese, or Hispanic, he would explain that he is half black
and half white.  Id.  He also indicated that while he has often been mistaken for being
Hispanic or Pacific Islander, he may have volunteered information about his heritage
because it is a source of pride for him.  UMF Nos. 1, 3.

      That said, given that it is difficult to identify Plaintiff's ancestry by his appearance
alone, Plaintiff contends he was subjected to further comments questioning the veracity
of his assertions as to his heritage.  For example, in 2013, an African-American citizen
went to the Sheriff's Office to report a traffic incident.  Compl. ¶ 19(j).  Rather than assist

3

the citizen, Deputy Kuhn purportedly stated, "Let Mike talk to him, Mike claims to be Black," the implication being either that Plaintiff was not African-American or that he should be responsible for serving that particular citizen because they were of the same race. Id. In addition, Plaintiff avers that Deputy Kuhn approached another deputy to ask that deputy whether he believed Plaintiff was black and accused Plaintiff himself of lying about the same thing. Id. ¶ 19(l). Plaintiff later showed Deputy Kuhn a photograph of his son, to which Deputy Kuhn responded by asking "how Black does he claim to be?" Id. ¶ 19(m). Kuhn claimed to have made the above comments in jest, but he was nonetheless ordered to attend sensitivity training. UMF Nos. 67-70. Otherwise, Defendants failed to take sufficient corrective action, and they aided and abetted the wrongdoing.

Plaintiff further avers that, based on his race, he was assigned the "oldest, smallest, and most damaged car in the Sheriff's fleet." Id. ¶ 19(f). According to Plaintiff, "[that] car was too small for Plaintiff to use comfortably, and was in a state of disrepair." Id. On the other hand, "[e]very non-African-American Sheriff's deputy was assigned a newer, larger, better car." Id.

Defendants counter that Plaintiff was assigned a patrol vehicle with 60,000 miles on it, and he subsequently turned it in for service 3,800 miles overdue. UMF No. 78-80. He was counseled, but the following month he backed his vehicle into a parked car, causing minor damage. UMF No. 81. Eight months later, Plaintiff was purportedly assigned a Crown Victoria with 30,000 miles and minor cosmetic damage. UMF No. 82. The following December, Plaintiff complained of back pain and requested a Sport Utility Vehicle ("SUV"). UMF No. 83. He was then assigned an SUV with 48,000 miles. Id. Six months later, Plaintiff ran over a stump with the SUV, causing $8,751 in damage, and rendering the vehicle inoperable. UMF No. 84. He was thereafter assigned another SUV, this time one with approximately 100,000 miles. UMF No. 85. After yet another accident, Plaintiff was assigned an SUV with 4,800 miles. UMF No. 86.

///

Plaintiff does not dispute any of the foregoing, but offers evidence that more junior officers nonetheless received newer cars and that his collisions occurred as a matter of course in the performance of his duties such that they should not have resulted in adverse action. DMF Nos. 85-87. More specifically, Plaintiff contends he was on a call when he ran over a stump, and despite having carried out a customary tactic and having done nothing wrong, he was sent a bill for the required repairs to the SUV, which was uncommon by itself. DMF Nos. 88-90. According to Plaintiff, collisions are a common occurrence for Sheriff's Office vehicles, thus implying that they should not have subjected him to being assigned a sub-par vehicle. DMF No. 91.

In addition to the above, Plaintiff contends that he was denied a variety of transfer opportunities and refused a promotional opportunity to take a position in Alternative Custody Supervision ("ACS") program. Compl. ¶¶ 19(g), (h). Although he qualified for the positions, they were given to similarly situated or less-qualified non-African-American candidates. Id.

More specifically as to the ACS program, Deputy Duch was responsible for interviewing candidates. Id. ¶ 19(h). Plaintiff was granted an interview, but during his allotted time, Deputy Duch stood up, left the room without saying a word, and never returned. Id. According to Defendants, although Plaintiff interviewed well, his reputation for being quick to arrest led the ACS team to believe other officers would be a better fit. UMF Nos. 42-43. Team members also purportedly viewed Plaintiff as "heavy-handed" and "aggressive," which were not traits that would be a good fit with the team. UMF No. 44. Plaintiff was ultimately not selected for the available spot.

Nor was he chosen for a position he sought on the Gang Unit in March 2012. UMF Nos. 48-49. That position required individuals to work with little to no supervision, and, Defendants contend, although Plaintiff again made the list of top candidates for the job, he was not chosen because another candidate had a proven history as a SWAT

///

///

team member, worked well with the Gang Unit, and had a similar schedule as other Gang Unit members, making scheduling and training more efficient.  UMF. No. 49.[5]

Plaintiff has submitted evidence, however, to show that he too required little supervision, that there was, in fact, very little supervision of the patrol units to which he was already assigned, and that other deputies actually required more supervision than he did.  DMF Nos. 80-84.  Plaintiff also emphasizes that no African-American person has ever served on the SWAT Team, on the Gang Unit, or as an administrator within the Sheriff's Department.  DMF Nos. 61-62, 64.

Aside from the foregoing, Defendants also contend that Plaintiff's performance was in general less than stellar and thus affected his ability to promote or transfer.  For example, on one occasion when Plaintiff was scheduled to work in the courthouse at 7:30 a.m., he failed to show up until 1:00 p.m. because he was home waiting for a cable installer.  UMF No. 23.  He was thus required to sign a contract indicating he would appear for work on time and would notify his supervisor each day when he arrived.  In addition, Plaintiff was found leaving work early without authorization.  UMF Nos. 26-28. He likewise failed to timely return from a lunch break when he was assigned to a courtroom during a jury trial.  UMF No. 29.  Plaintiff later received a performance evaluation based on the foregoing, pursuant to which he agreed to arrive on time ready to work and that he would not leave early without permission.  UMF No. 30.  He nevertheless thereafter continued to be late to work and to leave his post without prior approval, such that he was counseled several more times and transferred to patrol. UMF Nos. 31-37.

In addition, Plaintiff was suspended for violating jail rules by carrying a knife into a secure area of the jail.  UMF No. 51, 60.  He showed it to a nurse and said, "Do you want some of my TAC knife?"  Id.  He was thereafter concerned the nurse would take his comment as a sexual advance, and he tried to clarify that he was referring to his

_____

[5] Plaintiff also applied to the Gang Unit in December 2013, to no avail.  UMF Nos. 48, 65.

weapon.  UMF Nos. 52-53.  Plaintiff reported the incident to his sergeant himself because he was worried that the nurse would tell a woman Plaintiff had been seeing, one of the nurse's co-workers, that he had been behaving inappropriately.  UMF Nos. 55-56.[6]

Finally, according to Defendants, Plaintiff had had sexual relationships with approximately ten County employees within the Sheriff's Department, courts and potentially other departments.  UMF No. 57.  Plaintiff was also known to have texted pictures of his penis and of nude women to other deputies.  UMF Nos. 58-59.

In response to the foregoing, Plaintiff counters that he was disciplined for conduct that would have been overlooked had it involved other deputies.  Plaintiff offers evidence that it was not common practice for deputies to notify supervisors if they expected to be late for a shift.  DMF No. 44.  He also contends that other deputies often arrived late for their shifts (or left early) without being disciplined.  DMF No. 45, 47.  Despite the purportedly lackadaisical approach to scheduling, Plaintiff contends he was further singled out for discipline for leaving early for a family emergency although he had previously notified supervisors.  DMF No. 46.  It was similarly common for other deputies to carry weapons (accidentally or otherwise) into the secure area of the jail without being subjected to discipline.  DMF Nos. 66, 70.  Finally, Plaintiff argues that other officers were often known to take and/or send explicit pictures of, among other things, their genitals.  DMF Nos. 98-99 (describing Lieutenant Boyd posing for a picture of himself with his own penis and scrotum tucked between his legs).  In fact, Plaintiff contends, among SWAT team members it was a long-standing tradition to take such photos with unattended cameras, so team members knew better than to leave cameras unsupervised.  Id.  Plaintiff thus takes the position that singling him out for discipline

///

---

[6] During arbitration, Plaintiff argued his discipline was racially motivated and a product of harassment.  UMF No. 60.  The arbitrator upheld Plaintiff's three-day suspension finding, "Deputy Sears clearly displayed unsatisfactory performance of a deputy sheriff in violation of Section 2.54(b) of the Butte County Personnel Rules."  UMF No. 62.

based on the foregoing further supports his contention that he was being targeted on account of his race.

Moreover, contrary to Defendants' above assertions, Plaintiff was actually given a written commendation recognizing his exceptional performance in 2013 by a sergeant within the Sheriff's Department.  Compl. ¶ 19(i).  According to Plaintiff, however, Defendants deliberately failed to include that commendation in his personnel file, and, despite Plaintiff's resulting complaints, continued to fail to do so until Plaintiff's labor union insisted.  Id.  Defendants, on the other hand, take the position that the Sheriff refused to recognize that commendation because Plaintiff's disciplinary proceedings were ongoing and it had been reported that Plaintiff was having trouble fitting in as a team member.  UMF No. 63.  Eventually, Defendants contend, Plaintiff's conduct improved and the commendation was accepted.  UMF No. 64.

At some point in time, well after Plaintiff complained, both the "mug shot" poster and the panda were taken down.  UMF Nos. 50, 60.  He eventually received a number of transfers he requested, UMF 77, was subsequently selected as a detective, DMF 63, and testified that since the beginning of 2015, "[t]hings became very pro African-American," UMF 91.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each

claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying the summary judgment standard to a motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. "However, if the nonmoving party bears the burden of proof on an issue at trial, the moving party need not produce affirmative evidence of an absence of fact to satisfy its burden." In re Brazier Forest Prods. Inc., 921 F.2d 221, 223 (9th Cir. 1990). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

9

such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the <u>onus</u> of proof is imposed." <u>Anderson</u>, 477 U.S. at 251 (quoting <u>Improvement Co. v. Munson</u>, 81 U.S. 442, 448 (1871)). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Id.</u> at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. <u>Anderson</u>, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

Against the foregoing backdrop, Defendants move for summary judgment on the bases that: (1) a number of Plaintiff's contentions are time-barred for failing to timely file his administrative complaints; and (2) even if all claims were timely, Defendants are entitled to judgment as a matter of law on the merits. Neither proposition is well taken in the current posture because a plethora of factual disputes preclude adjudication of this case short of trial.

///

First, Defendants contend that a number of the allegations underlying Plaintiff's claims (e.g., denial of promotions in 2012, hanging the panda and "mug shot" poster, displaying the swastika, some patrol car assignments, not receiving the commendation) are barred because they were not timely raised before the EEOC and DFEH.  See Defs.' Mot., ECF No. 17-1, at 9-10.  This argument assumes, however, that the "continuing violation" doctrine does not apply.  See Dominguez v. Wash. Mut. Bank, 168 Cal. App. 4th 714, 720-21 (2008).  "Under this doctrine, [an administrative] complaint is timely if discriminatory practices occurring outside the limitations period continued into that period."  Id. at 721.  "A continuing violation exists if: (1) the conduct occurring within the limitations period is similar in kind to the conduct that falls outside the period; (2) the conduct was reasonably frequent; and (3) it had not yet acquired a degree of permanence."  Id.  "As for 'permanency' it is achieved when the harassing conduct stops, when the employee resigns, or when the employee is on notice that further efforts to end the harassment will be futile."  Id. at 724.

Taking all of the facts presented to the Court as true, the conduct about which Plaintiff complains was so pervasive and so blatantly racially motivated that a trier of fact could reasonably conclude that the conduct was all similar in kind, occurred reasonably frequently (indeed, as Plaintiff alleges on a constant basis), and never acquired a degree of permanence.  As such, summary judgment would be improper.

Defendants' Motion fares no better as to the merits.  Plaintiff has offered sufficient evidence in the current posture to show that he was subject to discriminatory and harassing conduct, and there are numerous triable issues of fact as to whether Defendants' proffered reasons for their actions were legitimate or pretextual.  In fact, to recite the parties' positions above is enough to make clear that each of Defendants' arguments (e.g., complaints are based on isolated or stray remarks; conduct was sporadic or trivial; some words may not have been "unwelcome" in the culture of Plaintiff and his fellow deputies; Plaintiff was not subject to adverse actions), depend on the

///

resolution of material factual disputes.  There is simply no claim before the Court capable of adjudication as a matter of law.[7]  Accordingly, Defendants' Motion is DENIED.

**CONCLUSION**

Defendants' Motion for Summary Judgment (ECF No. 17) is DENIED.

IT IS SO ORDERED.

Dated:  September 19, 2017

MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[7] To this same end, the Court finds Defendants' argument that Plaintiff is estopped from raising certain claims arising out of the knife incident because the arbitrator upheld the discipline imposed to be unpersuasive.  The Court is not convinced that the issue was actually litigated and necessarily decided in the former proceeding.  See Lucido v. Superior Court, 51 Cal. 3d 335, 341 (1990).